tion. and 50 on the materials. These were saved in worse weather and with more labor and risk in proportion to the net value; and this case is, I think, hardly a fair precedent. Returning to the usual rate of salvage for saving cotton, as declared in the case of The Ocean Belle [supra], and the increased value of the property as compared with the bulk saved and the labor of saving it, we may well inquire if there is any sound reason for not following, as nearly as we may be able, the usual rates there declared. In the same opinion the learned judge says: "It is believed that no vessel or cargo has been lost on this coast in many years in consequence of an insufficient supply of wrecking vessels and men to save them." Can the same truthfully be said now? If not, the danger of tempting too many to the business of wrecking cannot be declared to be imminent, and it may not be claimed that the rates of salvage should be reduced on that account. The circumstances of large values saved by the wreckers, the numerous wrecks, and the then unusually high price of cotton saved, together with the fact that most of that saved was not in danger of immediate loss or greater damage,—all of which, at the time of the decrees on the cargoes of The Waltham, Harwood, Nesmith, and others in the fall of 1865, served to induce and justify a reduction of the rates of salvage,—are none of them found in this case. It is true that the price of cotton is now higher than when the decree of The Ocean Belle was rendered, but the price of labor, the value of vessels and their equipments, and all of the actual necessaries of life have likewise increased, and I can see no good reason for reducing, in parallel cases, the rates established. These cases cited have been the most recent, and, in fact, the only recent, cases that may be justly claimed to be parallel.

Referring again to the case before the court, I think that 35 per cent. on the net value of the cargo and 45 per cent. of the materials saved, after deducting the usual costs, charges, and expenses, is a reasonable salvage. This does not amount to quite what Judge Marvin declares to be the usual rates, but is, as I consider, a fair and liberal salvage and reward for the services rendered. Of the small amount of brass stripped from her bottom, and other small articles of materials saved from the entire abandonment by both master and original salvors, I do not consider, in view of the small amount and labor in obtaining it, 60 per cent. to be too much. In this case, as well as several of the more recent cases decided in this court, the attention of the court has been called to the fact that many of the smaller class of the vessels have been employed, and but few of the larger class (such as were found here years ago), have been engaged, and suggestions desired in regard to the practicability of discriminating, in giving salvage, between vessels of the smaller class, or larger ones, more

capable and efficient. Circumstances entirely distinct from wrecking have removed, in a great degree, this class of large and valuable vessels from the reef, and while I might desire to have them restored, the question naturally arises how is this end to be attained, and what effect would the discrimination suggested have? There is now a distinction made which reaches the masters and mates of the smaller vessels, and nothing now can be done but touch the per tonnage rate itself, or declare that the salvage of smaller vessels should be diminished or that of the larger increased. What can be.done? I am not ready to believe that diminishing the salvage awarded to smaller vessels for valuable services would. bring to our coast a large number of fine, efficient vessels, nor am I ready to say that I will, on account of large vessels, unconditionally increase the salvage decreed them. Small vessels are not capable of rendering as efficient service as larger, and where their services are less valuable, they consequently earn less; and I shall, at all times, discourage and object to the employment of smaller vessels to the exclusion of larger, but in the absence of larger, what is earned by them they are entitled to, being held at all times to a strict compliance as far as possible with the established rules of the court.

Decree accordingly.

---

PEALE (PERIN & GAFF MANUF'G CO. v.). See Case No. 10,981.

---

## Case No. 10,872.

Case of The PEA PATCH ISLAND.

[See App. Fed. Cas.]

---

## Case No. 10,873.

### In re PEARCE.

[21 Vt. 611; 6 Law Rep. 261; 2 N. Y. Leg. Obs. 267.]

District Court, D. Vermont. July, 1843.

BANKRUPTCY — OBJECTION TO DISCHARGE — OMISSION FROM SCHEDULE—WHAT IS AN UNLAWFUL PREFERENCE.

1. The objection to a bankrupt's discharge, on the ground that he has not made a full disclosure of his property, involves a charge of fraud and perjury, and ought to be substantiated by direct testimony. or by such facts as afford unequivocal circumstantial evidence of it.

2. The fact that a bankrupt has omitted to state in his schedule demands due to him, which were really worthless, does not tend to prove him guilty of fraud.

3. A voluntary payment, or transfer, by an insolvent debtor, who is going on with his business, with a bona fide intention and expectation of saving himself from failing. and of paying his debts, is not an unlawful preference, within the meaning of the bankrupt law.

4. A voluntary conveyance. by an insolvent debtor, of a portion of his property, made in the